## BALINOVIC v. EVENING STAR NEWSPAPER CO.

### No. 7394.

United States Court of Appeals for the District of Columbia.

Decided May 6, 1940.

RUTLEDGE, Associate Justice, dissenting.

———◆———

Alvin L. Newmyer, David G. Bress, and Lewis H. Shapiro, all of Washington, D. C., for appellant.

Edmund L. Jones and George Monk, both of Washington, D. C., for appellee.

Before STEPHENS, EDGERTON, and RUTLEDGE, Associate Justices.

EDGERTON, Associate Justice.

Appellant Balinovic sued the Evening Star on the theory that its delivery truck, negligently driven by its driver, injured him in a collision. The question is whether the District Court was right in directing a verdict for the defendant because the driver had left his route, and his work of delivering papers, and was chasing a traffic violator at the command of a policeman who jumped on the running board and stayed there.

The accident occurred on June 23, 1933, before the passage of the statute which imposes liability on the owner of a car for the acts of any person who drives it with his consent,[1] and the mere fact that the Star had entrusted its car to its driver did not make it liable.[2]

Appellant urges that when an agent is sent out in charge of a car he is "impliedly authorized" by his principal to aid in law enforcement at the command of a policeman. This comes to saying that he may assume that his principal, if present, would authorize the act. That depends upon the principal's disposition, the agent's knowledge of it, and the other circumstances. Perhaps sympathy with law en-

---

[1] D.C.Code, Supp. V, Tit. 6, § 255b.

[2] Peabody v. Marlboro Implement Co.,

63 App.D.C. 288, 72 F.2d 81, certiorari denied, 293 U.S. 601, 55 S.Ct. 118, 79 L.Ed. 693.

.forcement may be imputed to a newspaper. Perhaps this extends to a willingness to interrupt delivery of papers and risk damage to truck, driver and public in order to chase a criminal. But the fact remains that the Star's business is not chasing criminals but producing and selling papers. When its driver set out to catch a criminal he was doing the work of the District · of Columbia.[3]

■ When B, for his own purposes, borrows, controls, and directs A's driver, B is responsible for the driver's negligence[4] and A is not. An express authorization from an employer to his employee to do another's work under another's direction does not make the employer responsible for the employee's negligence in doing the work;[5] and no implied authorization can be more effective than an express one. "The master's responsibility cannot be extended beyond the limits of the master's work." Whose work it is depends on "who has the power to control and direct the servants in the performance of their work."[6]

■ Governmental immunity of the borrower does not subject the lender of the servant to liability. In Denton v. Yazoo & Mississippi Valley R. R. Co.[7] the plaintiff was injured by the negligence of a porter who was loading mail in a railroad car under the direction of a United States postal clerk. The porter was an employee of the railroad, hired and paid by it; but the Supreme Court held that the railroad was not liable. It said: "When one person puts his servant at the disposal and under the control of another for the performance of a particular service for the latter, the servant, in respect of his acts in that service, is to be dealt with as the servant of the latter and not of the former."[8] There, as here, the man alleged to have acted negligently was an employee of a private corporation. There the fact that he was doing public work under the direction of a public officer insulated the corporation from responsibility. A fortiori the same fact insulates the corporation here; for chasing criminals is more remote from the Star's work than loading mail was from the railroad's work. The railroad regularly carried mail. It regularly furnished men to load it. It was paid for doing so. It directed its porter to do the very work which he was doing when he injured the plaintiff. The Star, on the other hand, did not regularly participate in any direct way in the enforcement of the criminal law, was not paid to do so, and did not direct its driver to do so.

We need not decide whether the Star was obligated to furnish to the District a car and a man for use in catching criminals. Even if it was, it was not responsible to other persons for the man's negligence in doing the work. The railroad in the Denton case was obligated to furnish to the United States a car and a man for use in loading mail, and the Supreme Court held, unanimously, that the railroad was not responsible to other persons for the man's negligence in doing the work. It is true that the railroad's duty was created by a contract and the Star's supposed duty was not. But we know of no reason why a duty which is independent of contract should extend responsibility for negligent injury of bystanders farther than a duty which results from contract. It is urged that it was part of the Star's business, in the circumstances of this case, to supply equipment and man power to the

---

[3] It has been held repeatedly that one who helps a municipal officer, at his command or request, in pursuing criminals becomes for the moment a municipal employee, and if injured can recover compensation as such provided there is a compensation act which covers municipal employees. Monterey County v. Industrial Accident Comm., 199 Cal. 221, 248 P. 912, 47 A.L.R. 359; Village of West Salem v. Industrial Comm. of Wisconsin, 162 Wis. 57, 155 N.W. 929, L.R.A.1918C, 1077; Vilas County v. Industrial Comm. of Wisconsin, 200 Wis. 451, 228 N.W. 591; Mitchell v. Industrial Comm. of Ohio, 57 Ohio App. 319, 13 N.E.2d 736.

[4] Phelps v. Boone, 62 App.D.C. 308, 67 F.2d 574, certiorari denied, 291 U.S. 677, 54 S.Ct. 528, 78 L.Ed. 1065.

Whether the government should be responsible, as a private employer would be, in such cases as this, is for Congress to decide.

[5] Western Marine & Salvage Co. v. Ball, 59 App.D.C. 208, 37 F.2d 1004, certiorari denied, 281 U.S. 749, 50 S.Ct. 353, 74 L.Ed. 1161.

[6] Standard Oil Co. v. Anderson, 212 U.S. 215, 221, 222, 29 S.Ct. 252, 254, 53 L.Ed. 480.

When cars are loaned gratuitously, "the tendency is to hold that the chauffeur becomes the servant of the borrower." 42 A.L.R. 1446.

[7] 284 U.S. 305, 52 S.Ct. 141, 76 L.Ed. 310.

[8] 284 U.S. at page 308, 52 S.Ct. at page 142, 76 L.Ed. 310.

government. This can be true only if the word business is used in an unusual and extended sense. And in the circumstances of the Denton case it was part of the railroad's business to supply equipment and man power to the government, not only in such senses as can be urged here with respect to the Star but in the further senses that the railroad did so constantly and did so for profit. It is urged that it was the driver's duty not only to the public, but to the Star, to submit to the policeman's order. Even if that were true, it would not make the Star liable. In the Denton case it was the porter's duty to the railroad to submit to the postal clerk's order.

In the light of the Denton case we need not discuss at length Babington v. Yellow Taxi Corporation,[9] on which appellant relies. There a cab company's driver was killed while chasing a criminal on the order of a policeman, and the New York court sustained an award of compensation against the company. The cab, unlike the Star's truck, was subject to call for any lawful journey. Moreover, the limits of workmen's compensation and of tort liability are not necessarily identical. The Star, by putting the driver on the road and keeping him there, did not create the risk that the criminal-catching activities of the District would injure a bystander. Whether it created the risk that those activities of the District would injure the driver, with the result that an injury to him in the course of those activities might be regarded as arising out of and in the course of his employment by the Star, is a question which we need not decide.

Affirmed.

RUTLEDGE, Associate Justice (dissenting).

In my judgment the issue is not one of private, consensual agency.[1] Not all vicarious liability rests on consent of the principal, express or implied in fact, whether to the existence of the representative relation or to the particular activities of the agent which result in the claim of liability. Plaintiff does not contend that defendant consented in fact to the driver's criminal-chasing activities. He says that liability arises regardless of such consent and because, at the time of the injury, the driver was discharging a duty imposed by law upon the defendant, not merely as part of its newspaper operations in the narrow business sense, but as part of its broader obligation as a corporate citizen of the community.[2] Such a duty, if it exists, is inescapable by mere failure to consent or by refusal to perform it.[3]

Individuals, it is admitted, are under a duty to respond with their persons and property to a proper officer's summons for assistance in suppression of crime or apprehension of criminals.[4] Nor is it denied that they may become liable for injuries to third persons caused by the negligent or wrongful manner in which the duty is discharged,[5] although the boundaries of negligence and other misconduct may differ from those applicable to more normal activities.[6] It is urged that corporations are not immune to a similar duty and liability.

The foundation of the duty is both historical[7] and reciprocal to protection from criminal activities conferred through the policing of the community. Individuals

---

9 250 N.Y. 14, 164 N.E. 726, 61 A.L.R. 1354.

1 In the sense that the employer's consent to the particular activities of the employee resulting in the plaintiff's injury is necessary to bring them within the course of the employment. There was consent, of course, to the original employment.

2 "Implied consent," as used by plaintiff, means not subjective assent in fact, but a duty imposed regardless of that or even in the face of specific dissent.

3 Dougherty v. State, 1895, 106 Ala. 63, 17 So. 393. That the chase involves grave personal danger does not confer upon the citizen the privilege of refusing to serve.

4 2 Pollock & Maitland, History of English Law 580; Dougherty v. State, 1895, 106 Ala. 63, 17 So. 393; Babington v. Yellow Taxi Corporation, 1928, 250 N.Y. 14, 164 N.E. 726, 727, 61 A.L.R. 1354.

5 Jones v. Melvin, 1936, 293 Mass. 9, 199 N.E. 392; cf. Manwaring v. Geisler, 1921, 191 Ky. 532, 230 S.W. 918, 18 A.L.R. 192; Notes, 1922, 18 A.L.R. 197; 1925, 39 A.L.R. 1306. See also Montanick v. McMillin, 1938, 225 Iowa 442, 280 N.W. 608; 1938, 24 Iowa L.Rev. 163; 1938, 23 Iowa L.Rev. 651.

6 Cf. Babington v. Yellow Taxi Corporation, 164 N.E. loc. cit. 727; Schluraff v. Shore Line Motor Coach Co., 1933, 269 Ill.App. 569; note 11 infra.

7 Cf. note 4 supra.

and corporations alike receive the protection, regardless of their individual or corporate character and regardless of the nature of their primary business or personal activities. Therefore, it is said, a like duty is imposed upon both, and they are subject in equal degree to the burdens incident to receiving the common protection, one of which is to respond to the summons in circumstances like these with all appropriate resources of man power and equipment. Whatever may have been true under ancient conceptions of the limited nature of corporate existence and activity,[8] appropriate for a world largely unincorporated, it is too late in an incorporated age for corporations to claim exemption from such an obligation, which is common to all citizens and arises from benefits given to all alike, whether they be individuals or corporations.[9] The foundation of the duty and the capacity to discharge it are appropriate to corporations no less than they are to individuals. No valid reason for exempting them appears.

It follows, therefore, that corporations, by virtue of being such or of charter-imposed limitations upon the scope of ordinary business activities, are not immune to the general burden of response or to whatever liabilities it may involve. Clearly, therefore, it was the corporation's duty to surrender or supply the truck for the officer's use. Necessarily, if this was true, it was the driver's duty, not only to the public, but to his employer, to recognize

and submit to the officer's order. He was in charge of the truck and, as its custodian, stood in the place and stead of his incorporeal lord concerning its disposal when the order came. It was directed to him, not merely as an individual or passerby, a man of muscle or marksmanship, but as the custodian and driver of the defendant's vehicle. Had he not been such, it would not have been given to him. In complying, therefore, he acted not for himself alone, but as the agent or servant of his employer, in the discharge of his duty to it and of its duty to the public. In this capacity, and not merely as an individual, he had lawful power to appropriate the property for the purpose in hand. In doing so, he did not violate his obligation to the defendant or depart from the course of his employment. Rather, he fulfilled it.

But the question remains whether he continued to act as defendant's servant after surrendering the car and while operating it in the chase. It is said this was no part of the employer's work, which was printing and selling newspapers. That, however, does not meet the issue, which is whether it is part of a newspaper corporation's business with its equipment and man power to aid in policing activities, in the chase itself, as well as in preparing for it, when required to do so in the circumstances presented here. Clearly it would seem to be so unless corporations, because they are merely legal personalities, are to be relieved of the duty which individual

---

[8] It is ancient, but now discarded, law that corporations exist only for the purposes specified in the charter and in the incorporating statutes. So conceived, the corporation as such was immune to liability for tort or crime, a result not wholly indefensible when nearly all corporations were charitable or municipal in function. But the growth of business corporations and the correlative expansion of respondeat superior have destroyed the old immunity by progressive extensions of corporate liability to include tort, crime and exemplary damages. Cf. Miller, Criminal Law (1934) § 45. Nor is the liability limited entirely to such incidents arising in otherwise intra vires business. Correlative expansion of respondeat superior has destroyed the old notion that the principal's authorization of the particular conduct creating injury always is required for his liability. In some situations liability is imposed for prohibited acts and work. Limits remain, of course, but they are contracting ones, not expanding. The latest expansion of powers and duties, perhaps, is in recognition of the corporation as having part in the status, and therefore the obligations, of citizenship, whatever its special area of enterprise. Cf. note 9 infra.

[9] "As in the days of Edward I, the citizenry may be called upon to enforce the justice of the state, not faintly and with lagging steps, but honestly and bravely and with whatever implements and facilities are convenient and at hand. The incorporeal being, the Yellow Taxi Corporation, would have been bound to respond in that spirit to the summons of the officer if it had been sitting in the driver's seat. In sending Babington upon the highway, it knew or is chargeable with knowledge that man and car alike would have to answer to the call." Cardozo, C. J., in Babington v. Yellow Taxi Corporation, 164 N.E. loc. cit. 727.

citizens owe in this respect or unless the individual citizen's duty is to be limited so as to exclude any obligation to render services other than those which he can perform in propria persona. In my judgment there is no solid foundation in reason or authority for exempting corporations from the citizen's general obligation in this respect or for making their duty less broad than that imposed on individual citizens. The real issue, therefore, is one of defining the scope of the general duty. The question may be posed by inquiring whether the duty includes merely supplying equipment and services which can be rendered in propria persona or extends also to rendering the services through one's employees.

No authority squarely in point on this question as it affects liability in tort to third persons has been cited. But Babington v. Yellow Taxi Corporation, 1928, 250 N.Y. 14, 164 N.E. 726, 727, 61 A.L.R. 1354, is squarely in point to the effect that the employer's duty of response to the officer's summons includes supplying the driver and operating the vehicle through him as well as furnishing the conveyance itself. The obligation extends, as there defined, to "whatever implements and facilities are convenient and at hand," including "man and car alike." And it continues not only up to, but during the chase. In yielding his services *as driver,* not merely as strong man and marksman, the employee did not depart from the course of his general employment. His duty to his master, as well as to the public, required that he remain with the car, protect it as far as possible in the new circumstances, and return it to his employer at the conclusion of the chase. That was true, it was said, "even if it be assumed that the direction of the officer was not a binding order." A fortiori it was true, if the order was binding as here. It would be a strange rule which would require a man or a company to contribute his or its property and his personal services to the public protection and welfare, yet would exempt both from making available the services of their employees. In practical effect, this would exempt corporations from any obligation whatever to render personal service, since they can act only vicariously. It would throw the primary responsibility for discharging the duty up-

on the employee rather than the employer and disregard the servant's obligation to his master to remain with and protect its property to the fullest extent consistent with the emergency throughout its continuance. Such a consequence also ignores the fact that the summons is directed to car and driver, not merely to the employee as a passerby disconnected from and unrelated to the function of driving the vehicle of which he has charge.

It is said that the driver in chasing the criminal was doing "the work of the District of Columbia." That may be admitted without admitting that it was not also the work of the Star. Even in private law, it does not follow always from the fact that A is doing B's work that he is not also doing C's. The "work of the District" may be, and in this case (unlike one involving merely proprietary governmental functions ordinarily) I think it is, the work of every citizen of the District, individual or corporate. The citizen's duty —and "work"—as well as the District's, is to chase criminals, and in doing it he performs both the District's work and his own. When he responds he does not step aside from his own business and into something which is exclusively the concern of another. If private law gives any appropriate analogy, it is rather to "joint adventure" than to "agency" or "master and servant" as between the citizen who is required to respond and the municipality.

It does not militate against the basic principle that the Babington case involved the ultimate consequence of workmen's compensation for the driver, while this involves liability in tort to third persons injured by his alleged negligence. The consequences are distinct, but the principle from which both flow is identical, namely, that in driving the car the servant remained in the course of his employment and did not depart therefrom. The issue is not whether his driving or the officer's summons increased the risk of injury to himself or to strangers. That would be pertinent, though not conclusive,[10] on the causal issue. Logically it does not affect the question whether course of employment continued during the chase. If it did so continue, to that extent and as far as that issue was concerned, compensability and tort liability followed as legal consequences of the con-

---

, [10] Hartford Accident & Indemnity Co. v. Cardillo, 71 App.D.C. —, 112 F.2d 11, decided March 11, 1940.

tinuance. If it did not, neither would be appropriate. Any other rule would involve the paradox that the driver, at the same moment, was in the course of his employment for compensation purposes, but not so for purposes of liability of the master in tort to strangers injured by the identical act which injures the driver also. There may be circumstances in which such a distinction is appropriate, not on logical grounds, but for other reasons, such as differences in the volume of risk and therefore in the burden imposed upon industry.

No such reason is applicable here. If any difference in risk exists, it would seem that the heavier one, that more likely to occur, is injury to the driver rather than injury to strangers. If the former is appropriate for industry to bear on the principle that it occurs "in the course of the employment," the latter is also. That is true not only in logic, but in the scope and extent of the risk and burden of liability imposed. It may be argued that, apart from "course of employment," the two liabilities have different foundations, one in accident, the other in fault. But the force of the argument is greatly reduced, if not destroyed, when it is recalled that the boundaries of negligence or other misconduct are greatly restricted in situations of this character. Without attempting to determine how far, to some extent the ordinary standards of care are "off." The nature of the chase, the officer's control, the necessity for obedience, and other factors not present in the normal case of negligent action, make the task of proving negligence in these circumstances difficult, if not insurmountable.[11] The occasions will not be frequent in which such a summons as this will come to a particular employer, and when they do, the obstacles to recovery are such that the danger of it is slight.[12] The burden imposed upon industry therefore cannot be heavy and certainly is not greater than that imposed by allowing compensation for injuries sustained in identical circumstances by the employee.[13] That is true not only because of the attenuated character of the liability, but also because imposing it can involve no great departure from generally

---

[11] Clearly, the officer's immunity to some extent is extended to the person commandeered. Cf. Firestone v. Rice, 1888, 71 Mich. 377, 38 N.W. 885, 15 Am. St.Rep. 266, and McMahan v. Green, 1861, 34 Vt. 69, 80 Am.Dec. 665, cited 65 U.S.Law Rev. 582 (loc. cit.). But that immunity, while great, is not absolute, and it is at any rate questionable whether the person aiding is entitled to any greater immunity than the officer possesses. That he does not lose all responsibility for his conduct is shown by Jones v. Melvin, 1936, 293 Mass. 9, 199 N.E. 392. There plaintiff successfully carried the burden of proving negligence. But there were peculiar circumstances, none of which appear here, including the driver's apparent disregard of the officer's direction to slow down at intersections, the presence of the plaintiff in his vehicle and her violent protestations against his manner of driving. Her presence, protestations and demands to be allowed to get out may have created a special duty, not owing in other circumstances, to let her leave the vehicle before beginning the chase or perhaps while it was in progress.

[12] As shown by the jury's disagreement upon the special interrogatories submitted in this case, notwithstanding the direction of the verdict for the defendant.

[13] The only other case which appears to pass directly on the question, to which attention has been called, is Kennelly v. Stearns Salt & Lumber Co., 1916, 190 Mich. 628, 157 N.W. 378. That, likewise, was a compensation proceeding. The claimant, an employee of the defendant, was at work when a fire warden ordered him to assist in extinguishing a fire. In doing so he was injured. Compensation was denied, the court holding that the injury did not arise out of and in the course of the employment. Apart from other possible distinctions, the case is unlike the Babington case in that the employee there was not commandeered in his capacity of employee. He was in charge of no implements, vehicles or other property of the employer which the officer's order required him to use and his duty to his employer required him to protect in the emergency. His man power merely, not his trained capacity for special service, was required.

If the cases were squarely in conflict, the result in the Babington case appears the more reasonable one. Clearly the employee's work subjects him in the circumstances there and here to the risk of receiving the summons and therefore to the injuries following naturally from that risk. Cf. Hartford Accident & Indemnity Co. v. Cardillo, cited supra note 10. It is merely a difference in consequence, not in principle, to extend the liability to the present claim.

accepted conceptions of responsibility in a day when by statute [D.C.Code (Supp. V) tit. 6, § 255b] the owner of a car is made liable for the acts of any person who drives it with his consent. While the Star may not have consented in fact to the driver's operation of the truck during the chase, it cannot be assumed that it did not do so, in view of its clear duty to surrender the car for use in the chase when commanded by the officer. Such a surrender might well be held to constitute a consent within the meaning of the statute in a case involving an accident, such as this, arising after the statute took effect. But whether so or not, the mere fact that the accident occurred before the statute was enacted so that it is not technically applicable here, does not deprive it of significant bearing upon the question presented by this case. The existence of the statute shows that imposing the liability sought here would not carry presently prevailing conceptions of responsibility of automobile owners for operation of their vehicles by others (even exclusively about their own business) much, if any, beyond their present scope, and that the burden which doing so would lay upon industry is not one too heavy or inappropriate for industry to bear.

In my view, therefore, cases like Denton v. Yazoo & M. V. R. R., 1932, 284 U.S. 305, 52 S.Ct. 141, 76 L.Ed. 310, relied upon by the majority, and others involving exchange of masters temporarily in private business or in the conduct of proprietary functions by government, such as handling the mails, are not in point. There the duty of the carrier arose from and was defined by the contract with the government. As the court construed the contract, it limited the duty to furnishing the man to do something the carrier was in no way obligated to do apart from the contract or by it. The duty being so created and limited, the carrier was neither obligated to do the work in the course of which the injury occurred nor responsible for the way in which it was done. The case therefore involved merely an application of the ordinary principles of respondeat superior as developed in the law of private agency. This is not such a case. Here the duty is not contractual and therefore not confined in scope by contractual limitations concerning what it includes. It is rather a nondelegable public duty imposed by operation of law directly upon the corporation itself, regardless of its assent and incapable of negation or limitation by private contract or dissent. It exists because the law requires the corporation, as it does all other citizens, to aid the officer "to enforce the justice of the state * * * [as] if it had been sitting in the driver's seat."[14] That duty exists not merely before and up to the very moment the chase begins, but while it continues. It is contemporaneous and coextensive with the officer's need for aid. That is the duty imposed upon individuals; it is no more to ask of corporations than it is to demand of private persons. To ask less would be to exempt corporations from a duty and a liability which it is as reasonable and practical for them to bear as it is for individuals, and reciprocal to which they receive like benefits. As with the individual citizen, the corporation's duty is not merely "to furnish" services to be used by another in doing something in which the corporation has no further interest. Its protection comes, as does the individual citizen's, from the enforcement of the "justice of the state," not merely from the preparation, or furnishing of facilities, to enforce it. If the duty is reciprocal to the benefit it cannot stop when the crucial stage begins. The case, therefore, is not one in which analogies drawn to duties created by private contract and the law of private agency are controlling. In my judgment the Star had the same duty, in character and extent, as any citizen; and therefore it was one not merely to supply men and equipment, but to aid in the very act of chasing the criminal.

The existence of the duty and of the liability incident to discharging it is not negatived by the mere fact that it, unlike individual citizens, could perform the obligation only through the acts of some human being. The driver, for this purpose, was not merely the Star's employee doing its ordinary business; he was the Star itself, giving body and action to its incorporeal being, and discharging one of its highest obligations of corporate citizenship. In my view all of the reasons which require individuals not to stop short of the chase, but to go on and take part in it as part of the price they pay for being citizens and receiving the benefits of community life, apply with equal force to corporate beings. They should share the burden of discharging the citizen's full duty with men and women of flesh and blood unless there is some valid reason for ex-

---

[14] Cf. note 9 supra.

cusing them in whole or in part. I am unable to discover such a reason in the situation presented by this case. It is not one, as I view it, that the only way, practically speaking, in which a corporation can share the citizen's full duty, in the chase as well as in getting ready for it, is by responding in damages when the driver it selects and places in charge of its vehicle exceeds the officer's immunity while operating it. On the contrary, that is reason for its sharing in that manner and to that extent.

In my judgment, therefore, the driver did not depart from the proper sphere of corporate activity or from his own employment when he entered upon and took part in the chase. In doing so, he discharged his employer's duty to the public and his own duty to the employer, as well as his own personal obligation of citizenship. I am unable to conclude that a corporation is inherently incapable of bearing and performing such a duty as is involved here or that there is any valid reason for making its duty an attenuated one as compared with that of human beings. If it is capable of discharging the full obligation, I cannot agree that it should not do so or should be immune from the tenuous liability to others which may result from the way in which it is performed. Accordingly, I think the judgment should be reversed and the cause remanded to the trial court for further proceedings, however onerous the burden of proof which plaintiff might have to carry in another trial.