# ELZA L. KEESLING v. STATE OF MARYLAND

[No. 92, September Term, 1979.]

*Decided October 2, 1980.*

580

The cause was argued before MURPHY, C. J., and SMITH, DIGGES, ELDRIDGE, COLE, DAVIDSON and RODOWSKY, JJ.

*Weldon Leroy Maddox* for appellant.

*Glenn W. Bell, Assistant Attorney General,* with whom was *Stephen H. Sachs, Attorney General,* on the brief, for appellee.

COLE, J., delivered the opinion of the Court. MURPHY, C. J., and RODOWSKY, J., concur in part and dissent in part. SMITH, J., dissents. RODOWSKY, J., filed an opinion concurring in part and dissenting in part at page 592 *infra,* in which MURPHY, C. J., joins. SMITH, J., filed a dissenting opinion at page 593 *infra.*

We shall decide in this case whether the Court of Special Appeals erred when it affirmed the Circuit Court for Anne Arundel County which granted the State's motion for summary judgment on the ground that the appellant had failed to allege a violation of Maryland Code (1957, 1970 Repl. Vol.), Art. 66½, § 9-102,[1] which provided, under certain circumstances, for damages to a citizen who is injured as a consequence of the police having commandeered his motor vehicle to apprehend suspected criminals.

The events which gave rise to this high speed chase on the Maryland highways occurred on August 1, 1972. Officers Todd and Lacson of the Friendship Airport Police Department received a call that a man and woman were attempting to depart from the Friendship International Hotel without

---

1. The statute is presently codified at Maryland Code (1977), §§ 19-101 and 19-102 of the Transportation Article.

paying their bill. The officers proceeded to investigate the call and, after receiving a description of the suspects, intercepted Richard Dale and Laura Gray walking toward the airport. The officers stopped the suspects and began to talk to them about the hotel incident. At this point Dale brandished a gun and ordered Lacson to unlock the rear door which he did. Dale disarmed the officers, got into the police car and ordered the officers to drive them to Washington, D.C. The officers attempted to persuade Dale that he should return to the hotel but Dale refused, informing the officers that he was in "bad trouble" because he had just shot a man at the hotel. Lacson then convinced Dale that they needed gas to make the trip and pulled into a gas station. At this time a report was received over the police car radio regarding the shooting and requesting the officers to respond. Lacson convinced Dale that he should answer and advised the dispatcher that he was unable to respond and that he was enroute to Washington, D.C. In the process, he was able to depress the button on the microphone, thereby enabling continued transmission of the conversation occurring within the police car.

The officers and their captors then proceeded along the Baltimore-Washington Parkway toward Washington. Again Officer Lacson attempted to dissuade the suspects from continuing and stated that the parkway would be covered with police vehicles from various jurisdictions. The affidavits of Officers Todd and Lacson, as well as other papers in the court file, suggest that Dale ordered Officer Lacson to stop a blue Rambler which was proceeding in front of the police car, that the idea to stop the Rambler was solely that of Dale, and that Officer Lacson tried to persuade Dale not to follow through with this plan.

In stark contrast, Laura Gray, in her affidavit, maintains that the idea to stop the citizen's auto was suggested by the officers. According to her, the officers said: "It's foolish to try to get away in a marked police car. It'll draw too much attention. You should be in an unmarked car."

Officer Lacson in his affidavit admitted that he utilized

his beacon light and siren to stop the vehicle. He further stated:

> The vehicle pulled over and I pulled in behind him. I asked him if I could approach the vehicle before he did so the man would not panic and he agreed to this but followed me. I went up to the vehicle and explained to the gentleman what was going to happen. I then asked the subject not to hurt the man. He said "alright, get the hell out of here . . . ."

Dale and Gray entered the vehicle and ordered Elza Keesling, the plaintiff in this case, to drive. Officer Lacson got into a State police vehicle which had come onto the scene and Officer Todd got back into his own vehicle. A prolonged chase ensued involving police cars and helicopters from several jurisdictions. After avoiding two roadblocks, the Keesling vehicle was finally boxed in by a third moving roadblock and brought to a halt. During the chase, Dale had threatened to shoot the plaintiff; however, when his capture was imminent, he shot himself instead. Keesling claims to have suffered serious and permanent injuries as a result of the incident.

Keesling sued the State of Maryland alleging a violation of Maryland Code (1957, 1970 Repl. Vol.), Art. 66½, § 9-102 (a), (b), and (c). The Circuit Court for Anne Arundel County granted the State's motion for summary judgment, from which judgment an appeal was taken to the Court of Special Appeals. That court affirmed, concluding that, even considering the facts in a light most favorable to the appellant, no violation of § 9-102 had occurred. This Court granted certiorari.

Appellant contends that summary judgment should not have been granted. He maintains that, accepting the Gray affidavit as true, a jury would be entitled to conclude that the police were negligent under subsection (b) in suggesting that the suspects commandeer an unmarked car, thereby bringing about a situation where danger and violence to the plaintiff were highly foreseeable. Appellant also asserts that

as a result of police conduct, his car became a device in a roadblock, with resulting injuries compensable under subsections (a) and (c).

The State contends that it was not the police who commandeered plaintiff's vehicle, but the suspects. It also maintains that the Keesling vehicle was not directed to participate in a roadblock, but was instead the subject of a roadblock. The State also raises two other issues. It asserts that the trial court should have granted appellee's motion for summary judgment on the basis of sovereign immunity and on the basis of Md. Rule 541c.

Summary judgment is proper only where there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Md. Rule 610. Here there is a dispute as to the facts. The affidavits and other matters conflict as to whether the idea to commandeer the Keesling vehicle was solely that of the suspects or whether it originated with the police. The existence of a dispute over a question of fact alone, however, will not preclude summary judgment. The disputed fact takes on significance when it is material to the outcome of the case. The Court of Special Appeals concluded that even accepting the facts in a light most favorable to the appellant, the fact was not material because no violation of § 9-102 had occurred. We disagree.

At the time of the occurrence, Maryland Code (1957, 1970 Repl. Vol.), Art. 66½, § 9-102 provided:

(a) *Commandeering vehicle and directing participation in road block prohibited.* — No police officer of this State, or of any political subdivision of this State, while acting within the scope of his authority in the enforcement of any law of the State or of the particular political subdivision, shall direct or order any operator, owner, or passenger of any motor vehicle within the limits of this State to assist him by commandeering the vehicle and directing the operator, owner, or passenger to participate in a road block in the apprehension of

any person suspected of having committed or known to have committed a violation of law.

(b) *Damages or injuries from negligence of police officer.* — If any police officer of this State, or of any political subdivision of the State, while acting within the scope of his authority in the enforcement of any law of this State or of the particular political subdivision, directs the operator of any motor vehicle (other than a police vehicle) within the limits of this State to assist him in the enforcement of the law or in apprehending any person suspected of having or known to have committed a violation thereof, the State or the political subdivision, as the case may be, shall be liable for damages or injuries proximately caused by the negligence of the police officer; provided, however, that the defenses of contributory negligence and "last clear chance" shall be available to the State or political subdivision. For purposes of this section, the Baltimore City police shall be considered police officers of Baltimore City, and the term "police officer" shall be deemed to include all persons charged with law enforcement. The fiscal officers of the State or political subdivision, as the case may be, shall forthwith or as soon as possible pay all just claims made or judgments entered pursuant to this section from funds within their control and available for that purpose.

(c) *Damages or injuries from participation in road block.* — If any police officer of this State, or of any political subdivision of this State, while acting within the scope of his authority in the enforcement of any law of this State or of the particular political subdivision, directs the operator of any motor vehicle (other than a police vehicle) within the limits of this State to participate in a road block to assist him in the enforcement of such law or in apprehending any person, suspected of having or known to have committed a violation thereof, the State or the polit-

ical subdivision, as the case may be, shall be liable for damages or injuries directly resulting from, or directly attributable to the participation in the road block; provided, however, that the defenses of contributory negligence and "last clear chance" shall be available to the State or political subdivision. For purposes of this section, the Baltimore City police shall be considered police officers of Baltimore City, and the term "police officer" shall be deemed to include all persons charged with law enforcement. The fiscal officers of the State or political subdivision, as the case may be, shall forthwith or as soon as possible pay all just claims made or judgments entered pursuant to this section from funds within their control and available for that purpose.

The history and legislative background of the right of police to require citizens to assist in the enforcement of the law provide valuable insight as to the purpose and intent of the statute. At common law an officer of the law possessed the power to summon the assistance of a private citizen to aid him in the capture and arrest of a fleeing felon. 10 *Halsbury's Laws of England* 345 (3rd ed. Simonds 1955); 1 *Wharton's Criminal Procedure* 146 (12th ed. C. Torcia 1974); *see State v. Goodman,* 449 S.W.2d 656, 661 (Mo. 1970). Refusal to respond to an officer's request constituted a crime, 1 *Wharton's Criminal Procedure, supra* at 146, and the fact that the citizen was exposed to danger was no excuse. *Dougherty v. State,* 106 Ala. 63, 17 So. 393 (1895).[2] This common law duty to render assistance was related to the obligations imposed by the English statutes concerning hue and cry and the *posse comitatus.* The hue and cry was a loud

2. Some American jurisdictions have provided by statute that the failure to respond to an officer's call for assistance constitutes a crime. There is some authority for the proposition that in the absence of statute the failure to respond is not a crime. *See* Kagel v. Brugger, 19 Wis. 2d 1, 119 N.W.2d 394 (1963); 6A C.J.S. Arrest § 50 (1975). Whether such failure constitutes a common law offense in Maryland by virtue of Article 5 of the Maryland Declaration of Rights is a question not now before the Court. *See generally* 1 J. Alexander, British Statutes in Force in Maryland 207-211, 271-72 and 287-88 (1912).

outcry with which felons were pursued. All who heard the call were bound to participate in the chase and use their best efforts to capture the absconding felon. 1 *Russel on Crime* 503 (11th ed. J. Turner 1958). A similar power was vested in the sheriff who could summon the *posse comitatus,* or power of the county (consisting of all the adult males of the county) to arrest a felon. Every man was to have his horse ready in the event the demand for assistance was made. *See Babington v. Yellow Taxi Corporation,* 250 N.Y. 14, 164 N.E. 726 (1928) (Cardozo, J.). *See generally* 1 J. Alexander, *British Statutes in Force in Maryland* 207-211, 271-72 and 287-88 (1912). A natural outgrowth of these obligations, and in particular that of having one's horse available, was the common law power to commandeer the motor vehicle of a private citizen. *Babington v. Yellow Taxi Corporation, supra; Kagel v. Brugger,* 19 Wis. 2d 1, 119 N.W.2d 394 (1963).

In Maryland the common law power of an officer of the law to summon a private citizen to aid him in the enforcement of the law was recognized in *The State v. Mayhew,* 2 Gill 487 (Md. 1845). In holding valid legislation which required bank officers to collect taxes payable by individual owners on the capital stock of the bank, the *Mayhew* Court analogized the circumstances of that case to other instances in which the State may command the aid of private citizens in enforcing the law:

> Every citizen summoned by an executive officer to aid him in the preservation of the public peace, or in the service of civil or criminal process, or in the arrest of a felon, is bound to perform the services required, although it may subject him to danger, as well as "additional labor, trouble and expense." [*Id.* at 501.]

In *Turner v. Holtzman,* 54 Md. 148 (1880), the Sheriff of Baltimore County deputized, in writing, a private citizen to preserve order at a camp meeting. The deputy was also given the power to appoint special officers to aid him. In holding

that the deputy and his appointed assistant could abate a public nuisance on a public highway, the Court declared:

> There can be no doubt that the sheriff has the power of keeping the peace within his county, 8 Bacon's Abr. 689, and to raise the *posse comitatus* to aid him, when necessary in executing his office. We think it equally clear that the sheriff or his deputy may abate a public nuisance in a public highway; and that Turner, as deputy sheriff, had the lawful authority to remove the coach of the appellee, when he found it obstructing the public highway and preventing other parties, who had a right to use the same, from traveling upon it, and to remove the appellee with it, if he did not choose to leave his seat, or to arrest him if he should resist him in its removal. He also had the right to call to his assistance the other appellant, Stoddard, and such other persons as he might deem necessary in effecting the abatement of this nuisance thus caused and maintained by the appellee. [*Id.* at 159-60.]

*See South v. Maryland ex rel. Pottle,* 59 U.S. (18 How.) 396, 402, 15 L. Ed. 433 (1856); L. Hochheimer, *Crimes & Criminal Procedure* § 60 (2d ed. 1904).

Because misfortune and injury befell many citizens when the common law power was exercised, the legislature enacted the precursor to subsection (b) of § 9-102 in Chapter 38 of the Laws of Maryland, 1951. In essence, this section (then designated as § 130A of Article 66½) provided for damages for injuries proximately caused by the negligence of a police officer who had directed the operator of a motor vehicle to assist him in the enforcement of law. It is important to note that the section did not abrogate the common law power, but only provided a remedy when negligence was involved. The Legislative Council explained the bill's purpose:

> This bill is submitted by the Legislative Council following an unusual accident which recently

occurred in Baltimore City. A motorist while driving along the streets of the City was commandeered by a police officer to give chase to another motorist. During the course of the chase, the motorist with the police officer ran through a red light and caused damage both to his car and to a taxicab which he struck. The question was then raised as to whether anyone would be responsible for the damages to these two parties, each of whom could claim a measure of innocence. This bill would place the responsibility for paying such damages upon the State or the political sub-division represented by the police officer. [2 Maryland Legislative Council, Report to The General Assembly of 1951, Proposed Bills A54.]

That which is designated as subsection (c) was added in 1957. Laws of Maryland, 1957, Chapter 705. It imposed liability for injuries to the operator of a motor vehicle who had been directed to participate in a roadblock. Unlike subsection (b), no negligence needed to be shown. Merely by directing the operator to participate in a roadblock the State was exposing itself to potential damages.

The final section to be enacted was that designated as subsection (a). Laws of Maryland, 1968, Chapter 475.[3] That subsection absolutely prohibited a police officer from commandeering a vehicle for the purpose of directing the operator's participation in a roadblock.

With this understanding of the origin and purpose of the statute and the meaning of its separate sections,[4] we exam-

3. As originally proposed, House Bill 774 of the 1968 Session of the General Assembly would have totally prevented the police from commandeering a vehicle not only for roadblock purposes, but also for purposes of apprehending suspects. However as finally enacted, the provision contained no flat prohibition against commandeering a vehicle and then directing the operator to assist in the apprehension of a suspect. This action by the General Assembly suggests that it recognized the common law power to commandeer vehicles and that it did not desire to abrogate the power absolutely (other than for roadblocks), but only intended to provide a remedy where negligence by law enforcement officers was involved.

4. For purpose of deciding whether the statute has been violated, subsections (a) and (c) are to be read together while subsection (b) stands on its own. Subsection (c) provides a remedy for damages resulting from

ine the statute to determine whether a violation has occurred. Subsection (b) is not limited to the peculiar fact situation which gave rise to its enactment; it is remedial in nature and therefore is to be liberally construed. *State v. Barnes,* 273 Md. 195, 208, 328 A.2d 737 (1974). 3 A. Sutherland, *Statutes and Statutory Construction* 29 (4th ed. C. Sands 1974). It is designed to balance the various interests of the parties involved by recognizing the need of the police to occasionally command the assistance of a private vehicle while serving notice that in so doing the police must act reasonably and with due regard for the safety of the private citizen. Subsection (b) is basically reflective of the common law which required the circumstances to reasonably necessitate the call for assistance, 10 *Halsbury's Laws of England, supra* at 345; *see Dougherty v. State, supra.* Nevertheless the common law imposed a duty on the police in carrying out their responsibilities to take precautions for the safety of the public. *Schneble v. State,* 201 So. 2d 881, 883 (Fla. 1967); *aff'd on other grounds sub nom. Schneble v. Florida,* 405 U.S. 427, 92 S. Ct. 1056, 31 L. Ed. 2d 340 (1972); *accord, Evalt v. United States,* 359 F.2d 534 (9th Cir. 1966); *Wallner v. Fidelity & Deposit Co. of Maryland,* 253 Wis. 66, 33 N.W.2d 215 (1948); 6A C.J.S. *Arrest* § 45 (1975). If a police officer in performing his responsibilities places a private citizen in a zone of danger without reasonable justification, he may be liable for injuries proximately caused by his negligence. *Brooks v. Lundeen,* 49 Ill. App. 3d 1, 364 N.E.2d 423 (1977); *Lubelfeld v. City of New York,* 4 N.Y.2d 455, 151 N.E.2d 862 (1958); *Hale v. Smith,* 254 Or. 300, 460 P.2d 351 (1969).

The trial court in granting the State's motion for summary judgment held that there was no violation of § 9-102. We set forth the test to be applied in determining if summary judgment should be granted in *Brown v. Suburban Cadillac, Inc.,*

---

that which subsection (a) prohibits. Our interpretation is reinforced by the reorganization of these sections in the Transportation Article. Maryland Code (1977), §§ 19-101 and 19-102 of the Transportation Article. Former subsection (b) now stands alone as § 19-101. Former subsections (a) and (c) have been joined in § 19-102.

260 Md. 251, 272 A.2d 42 (1971). Judge Finan stated for the Court that

> [t]he purpose of a hearing on a motion for summary judgment at the trial level is not to try the case on its merits, but rather to decide whether any real dispute as to material facts exists. . . . If the pleadings, depositions, admissions, and affidavits (if any) show that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law, then summary judgment should be granted. . . . Conversely, if there is a genuine dispute as to any material fact, summary judgment would not properly be granted. . . .
>
> An appellate court, in reviewing a motion for summary judgment, should be concerned primarily with deciding whether or not a factual issue exists, and in this regard, all inferences should be resolved against the party making the motion. [*Id.* at 254-55 (citations omitted).]

*See Berkey v. Delia,* 287 Md. 302, 413 A.2d 170 (1980); *Peck v. Baltimore County,* 286 Md. 368, 410 A.2d 7 (1979); *Honaker v. W.C. & A.N. Miller Dev. Co.,* 285 Md. 216, 401 A.2d 1013 (1979); *Sherman v. Am. Bankers Life Assur.,* 264 Md. 239, 285 A.2d 652 (1972).

Thus, the issue in this case is whether the police negligently commandeered the Keesling vehicle and thereby forced him to participate in the apprehension of persons who had committed a crime and whether the Keesling vehicle was forced to participate in a roadblock. Commandeer is defined as "to order or force into military [or police] service" or "to seize . . . for public use." Random House Dictionary of the English Language 295 (The Unabridged Ed. 1973).

As we see it, the facts that may be adduced from the affidavits of Laura Gray and Officer Lacson give rise to jury questions as to whether

> 1) the officers suggested that the criminals make their escape in an unmarked vehicle;

2) the use of the beacon light and siren was a command to Keesling to stop which he did in obedience thereto; and

3) the officer's approach to the vehicle and explanation to Keesling of what was happening amounted to a direction or order to Keesling to cooperate in the apprehension of the criminals.

It is a question for the jury to decide whether this conduct of the police fell so far below the duty of police to protect the welfare of the public as to amount to negligence.

While it is possible that the jury may conclude that the officer acted reasonably under the circumstances, and/or that his conduct did not amount, in effect, to ordering Keesling to participate in a roadblock, it could just as well conclude that the tactics employed by the officers were without regard for the welfare of Keesling and were designed to free themselves from their captors so that they could resume the chase and apprehend the suspects in a roadblock in which the Keesling vehicle would be employed.[5] The jury could conclude the officer ordered Keesling to cooperate, if not expressly, at least by the objective appearance of his words and actions. The jury could reasonably infer that the officer's words and actions, taken as a whole, were such that the officer must have known he would be interpreted as having commanded Keesling directly to cooperate.

If the jury were to believe that the officers set in motion a chain of events which they knew or should have known would lead to the commandeering of the Keesling vehicle and would likely lead to Keesling's injury by the criminals or by the police effort to stop the vehicle, then there would be a violation of the statute in two respects. First, the statute provides damages for police negligence when the police direct the operator of any motor vehicle to assist in the apprehension of a criminal suspect. Second, the statute prohibits police from ordering citizens to participate in a

---

5. Participating in the roadblock were 35 police cars, 2 motorcycles and a helicopter operated by members of the State Police, Greenbelt U.S. Park Police and the Prince George's County Police department.

roadblock and provides for damages for the citizen's injury if he is forced to do so. Under the facts here, a jury might find Keesling an unwilling participant, but a participant nevertheless. It was, therefore, error for the trial court to grant summary judgment.

We need not reach the other issues raised in appellee's brief as they were not decided by the trial court or Court of Special Appeals nor were they raised in the Petition or cross-petition for certiorari. Md. Rule 813.

For the foregoing reasons, we reverse the judgment of the Court of Special Appeals.

> *Judgment of the Court of Special Appeals reversed and remanded to that court with instructions to reverse the summary judgment entered in the Circuit Court for Anne Arundel County and remand to that court for further proceedings; appellee to pay the costs.*

*Rodowsky, J., concurring in part and dissenting in part:*

I agree that under the rules relating to summary judgment it was error to grant summary judgment in favor of the defendants as to the theory of liability predicated on a violation of subsection (b) of Article 66½, § 9-102 of Maryland Code (1957, 1970 Repl. Vol.). However, in my opinion, the defendants were entitled to judgment as a matter of law as to the theory of liability predicated on a violation of subsection (a), and accordingly, as to subsection (c). Subsection (a) requires that two elements be satisfied, (1) "commandeering the vehicle and [2] directing the operator ... to participate in a road block in the apprehension of any person suspected . . . ." Even if it is assumed that a roadblock can be moving, as well as stationary, the participation in it referred to in subsection (a) is participation as a blocker. By holding in effect that the vehicle to be blocked, *i.e.,* the object

of a roadblock, "participate[s]" in the roadblock itself, the majority has, in my view, exceeded the plain import of the statute.

Chief Judge Murphy authorizes me to state that he joins in this opinion.

*Smith, J., dissenting:*

Our cases are replete with statements to the effect that the cardinal rule of statutory construction is to ascertain and carry out the real legislative intent; that in determining that intent the Court considers the language of an enactment in its natural and ordinary signification; that we may not insert or omit words to make a statute express an intention not evidenced in its original form; and that, absent a clear indication to the contrary, a statute, if reasonably possible, is to be read so that no word, clause, sentence, or phrase is rendered surplusage, superfluous, meaningless or nugatory. *See, for example, Dorsey v. Beads,* 288 Md. 161, 175-76, 416 A.2d 739 (1980); *Messitte v. Colonial Mortgage Serv.,* 287 Md. 289, 293-94, 411 A.2d 1051 (1980); *In re James S.,* 286 Md. 702, 705, 410 A.2d 586 (1980); *Board v. Stephans,* 286 Md. 384, 388, 408 A.2d 1017 (1979); *Harbor Island Marina v. Calvert Co.,* 286 Md. 303, 311, 407 A.2d 738 (1979); *Baltimore Gas & Elec. v. Department,* 284 Md. 216, 219, 395 A.2d 1174 (1979); *Police Comm'r v. Dowling,* 281 Md. 412, 418-19, 379 A.2d 1007 (1977); *Comptroller v. Mandel Re-Election Com.,* 280 Md. 575, 578-79, 374 A.2d 1130 (1977); *Harden v. Mass Transit Adm.,* 277 Md. 399, 406, 354 A.2d 817 (1976); *Baltimore City v. United Stores,* 250 Md. 361, 368-69, 243 A.2d 521 (1968); and *Thomas v. Police Commissioner,* 211 Md. 357, 361, 127 A.2d 625 (1956). I submit that application of those principles to the statute in question compels an affirmance rather than a reversal here.

Maryland Code (1957, 1970 Repl. Vol.) Art. 66½, § 9-102 (applicable to this proceeding) provided in relevant part:

(a) *Commandeering vehicle and directing participation in road block prohibited.* — No police

officer . . . shall direct or order any operator, owner, or passenger of any motor vehicle . . . to assist him by commandeering the vehicle *and* directing the operator, owner, or passenger to participate in a road block in the apprehension of any person suspected of having committed or known to have committed a violation of law.

(b) *Damages or injuries from negligence of police officer.* — If any police officer . . . directs the operator of any motor vehicle . . . to assist him in the enforcement of the law or in apprehending any person suspected of having or known to have committed a violation thereof, the State or the political subdivision, as the case may be, shall be liable for damages or injuries proximately caused by the negligence of the police officer . . . .

(c) *Damages or injuries from participation in road block.* — If any police officer . . . directs the operator of any motor vehicle . . . to participate in a road block to assist him in the enforcement of such law or in apprehending any person, suspected of having or known to have committed a violation thereof, the State or the political subdivision, as the case may be, shall be liable for damages or injuries directly resulting from, or directly attributable to the participation in the road block . . . . (Emphasis added.)

Code (1957, 1968 Repl. Vol.) Art. 1, § 18 provides that captions or headlines of the several sections of the Code "which are printed in bold type . . . are intended as mere catchwords to indicate the contents of the sections" and "are not to be deemed or taken as titles of the sections . . . ." However, in this instance the title of § 9-102 as adopted by the General Assembly when it enacted the motor vehicle law by Chapter 534 of the Acts of 1970 was "Liability of State and local government for *commandeered* vehicles." (Emphasis added.) Thus, it is a part of the act itself and not a heading inserted by the codifier. Accordingly, we may use it in our

interpretation of the act. *State Farm Mut. v. Ins. Comm'r,* 283 Md. 663, 675, 392 A.2d 1114 (1978).

The term "commandeer" came from the Boer War. As originally used it meant "[t]o compel to perform military service; to seize for military purposes." *Webster's New International Dictionary* (2d Ed. Unabridged 1959) 537 and *The Oxford English Dictionary* (Compact Ed. 1971) 478. Colloquially it was defined as "to take arbitrary or forcible possession of." *Webster* at 537. More recently accepted definitions are "to take arbitrary or forcible possession of," *Webster's New International Dictionary* (3d Ed. Unabridged 1961) 455, and "to seize (private property) for military or other public use: *The police officer commandeered a taxi and took off after the getaway car,*" *The Random House Dictionary of the English Language* (Unabridged Ed. 1967) 295 (Emphasis in original.).

I need cite no authority for the fact that in the context here the word "direct," which appears throughout the statute, means "to command."

Subsection (a) is prohibitory, but it contains no provision authorizing payment of damages for its violation. It is patent, however, that to come within its prohibition two things must take place. First, a police officer must *direct* a person "to assist him by [the police officer's] commandeering the vehicle . . . ." Then, the police officer must *direct* that individual "to participate in a road block" for the purpose of apprehending a "person suspected of having committed or known to have committed a violation of law."

The plain meaning of subsection (b) is that one may recover for the negligence of a police officer only if he "*directs* the operator of any motor vehicle . . . to assist him in the enforcement of the law or in apprehending any person suspected of having or known to have committed a violation [of law] . . . ." (Emphasis added.)

Recovery under subsection (c) is permitted only where an officer "*directs* the operator of any motor vehicle . . . to participate in a road block to assist him in the enforcement of . . . law or in apprehending any person . . . ." (Emphasis added.)

I agree, as I must under our cases, that when we determine whether a summary judgment was correctly entered the facts must be considered in a light most favorable to the person against whom judgment was entered (the appellant here) and all inferences must be resolved against the party who made the motion (the appellee here). I believe that under that standard there is no way "the pleadings, depositions, and admissions on file, together with the affidavits" (to use the words of Maryland Rule 610) can be interpreted as giving rise to an inference that the police officers in question *commandeered* the Keesling vehicle; *directed* Keesling "to participate in a road block" for the purpose of apprehending a "person suspected of having committed or known to have committed a violation of law"; *directed* Keesling to assist them in the enforcement of the law or in apprehending any person; or *directed* Keesling "to participate in a road block to assist [them] in the enforcement of . . . law or in apprehending any person . . . ." I note specifically that the word "direct" is an integral part of each of the statutes in question. There is no suggestion that the officers *directed* Keesling to do anything. Accordingly, in my view the trial judge and the Court of Special Appeals did not err.